## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HDI GLOBAL SPECIALTY SE, | ) |
| | ) Civil Action No.: |
| | ) |
| *Plaintiff,* | ) |
| | ) **COMPLAINT** |
| v. | ) |
| | ) |
| NBIS CONSTRUCTION & TRANSPORT | ) |
| INSURANCE SERVICES, INC., | ) |
| | ) |
| *Defendant.* | ) |

Plaintiff, HDI Global Specialty SE ("HDI"), by its undersigned counsel, Weber Gallagher Simpson Stapleton Fires & Newby LLP, for its Complaint against Defendant, NBIS Construction & Transport Insurance Services, Inc. ("NBIS"), respectfully alleges as follows:

### NATURE OF ACTION

1.      HDI brings this action to address NBIS's multiple breaches of the parties' agreement under which HDI paid NBIS to perform services in connection with claims made under certain insurance policies.  In addition to the breaches, NBIS negligently handled the claims.

2.      Specifically, the parties entered into a Master Claims Management Agreement on August 28, 2015 and an Amended and Restated Claims Management Agreement on September 10, 2019 ("the TPA Agreement"). The TPA Agreement, attached hereto as **Exhibit A**, replaced the original Claims Management Agreement and, therefore, the original 2015 Agreement is not relevant to this proceeding. However, in addition to the TPA Agreement, the parties also entered into a Cover Holder/Managing General Underwriter Agreement ("the MGU Agreement") whereby NBIS provided underwriting services in addition to the claim handling services described in the TPA Agreement.

3.      NBIS, on behalf of HDI, issued Insurance Policy No. IICHMPP-0003090-00 to Omega Morgan, Inc. effective from March 1, 2019 to March 1, 2020 (the "Policy"). Included in the Policy was a Commercial General Liability Coverage Part. By Endorsement, the Policy's Named Insureds included Omega Morgan Sarens LLC and Omega Rigging & Machinery Moving, Inc. (collectively "Omega Morgan"). Omega Morgan's business description was "crane and rigging," the identical services that NBIS advertised as the "backbone of its business." Pursuant to the TPA Agreement, NBIS was responsible for, among other things, adjusting and managing claims under the Policy.

4.      A tower crane collapsed on April 27, 2019 in Seattle, Washington. There were four fatalities, several bodily injuries and a property damage claim submitted following the accident. Eventually, lawsuits were filed against multiple defendants including Omega Morgan.

5.      Pursuant to the TPA Agreement, NBIS provided services for HDI in connection with the claims brought against Omega Morgan. While providing services, HDI breached its obligations under the TPA Agreement.

6.      Further, independent of the obligations set forth in the TPA Agreement, NBIS owed a duty of care to HDI while handling the Omega Morgan claims, which it also breached.

7.      At trial, the jury rendered a verdict against Omega Morgan and another defendant and Judgment Orders were entered totaling $150,300,000.

8.      Because of NBIS's significant breaches that made Omega Morgan a target defendant at trial,  HDI issued a "Blue Sky" letter that waived its $2,000,000 policy limits.  As a result, HDI paid approximately $128,000,000 to settle the judgments and other lawsuits filed.

9.    Under the TPA Agreement, NBIS was obligated to indemnify HDI for, among other things, any direct loss, damage, cost or expense incurred by HDI arising out any negligent act, other tort, or breach of contract by NBIS.

10.    Although HDI has demanded payment from NBIS due to its breach of contract and negligence, it has not paid HDI for any portion of the judgments entered against Omega Morgan and paid by HDI.

11.    HDI now brings this action to seek redress for NBIS's breaches, mismanagement and other conduct causing loss to HDI.

## THE PARTIES

12.    HDI is a Societas Europaea organized under the laws of Germany, with its principal place of business in Hannover, Germany.

13.    NBIS is incorporated under the laws of Delaware, with its principal place of business in Atlanta, Georgia.

## JURISDICTION AND VENUE

14.    Jurisdiction and venue in this Court are proper pursuant to 28 U.S.C. §1332(a) because of the diverse citizenship of the parties and because the amount in controversy exceeds $75,000. Venue is proper in this Court pursuant to §23 of the TPA Agreement providing that the Agreement shall be governed and construed in all respects in accordance with the laws of the State of New York. Although the Agreement provides for the State Courts of New York to have jurisdiction, the parties have waived the State Court requirement and have agreed to proceed in this Court.

## FACTS

**A.    HDI Relied On NBIS, A Managing General Underwriter And Third-Party Administrator, Which Held Itself Out As An Expert In The Crane And Rigging Industry**

15.    At all relevant times, NBIS was a Third-Party Administrator and Managing General Underwriter ("MGU") advertising itself to the public as an expert in providing innovative risk-management focused solutions for crane and rigging industry clients in North America. Specifically, NBIS advertised itself as having more knowledge and expertise than any other company in the specialized field of crane and rigging.

16.    NBIS, as an MGU, issued policies to crane and rigging insureds under the authority delegated to it pursuant to contracts with various insurers, including HDI.

17.    HDI relied upon NBIS's expertise in the specialized field of heavy construction equipment, including its expertise in managing claims involving crane collapses. The MGU/TPA relationship between HDI and NBIS is important for understanding the level of trust and confidence HDI placed in NBIS's knowledge about the crane and rigging industry.

18.    The TPA Agreement obligated NBIS to handle claims on behalf of HDI pursuant to **SERVICE STANDARDS** including:

> 8.1    NBIS warrants that it shall provide the Services using all reasonable skill, care and judgment, in an efficient, competent, professional and cost effective manner as is consistent with NBIS being a specialist in this field and in accordance with accepted professional and business practices.
>
> 8.2    NBIS warrants that it shall use competent, appropriately qualified skilled and experienced personnel in the provision of the Services.
>
> ***
>
> 8.11    HGS [HDI] is required to observe and comply with the standards issued by the Regulators relating to Claims, including all

applicable Laws and/or Regulations. In light of the foregoing, NBIS shall ensure:

8.11.1  that all Claims are handled promptly and fairly;

\*\*\*

8.11.3  that a Claim is not unreasonably rejected (including by terminating or avoiding a Contract);

\*\*\*

Ex. A at NBIS 07687-88.

19.    The TPA Agreement at **SCHEDULE 1** contains the following obligations:

**PART A: THE SERVICES**

NBIS shall provide the following Services:

**1.    Claims Handling**

1.1    NBIS will handle Claims arising under the Agency Agreement.

1.2    NBIS will liaise on [HDI's] behalf with the Insureds on any Claims matter.

\*\*\*

1.12    Notwithstanding deadlines or other information set forth in this Schedule 1, Part A, NBIS shall be knowledgeable and comply with all applicable Laws and/or Regulations in the jurisdiction relevant to each Claim or Claim file, including all fair claims handling laws.  For example, but not by way of limitation, if any Laws and/or Regulations require a shorter deadline than set forth in this Schedule 1, Part A, NBIS shall comply with such shorter deadline.

1.13    NBIS will adopt a strong approach to litigation containment and management by reducing or avoiding litigation where reasonably possible through proactive Claims management.

\*\*\*

**2.    Administrator Management**

2.1    [HDI] views NBIS as an extension of its own Claims Team.  As such, NBIS will ensure it:

      a)      puts the Insured at the forefront of all activities and decisions;
      b)      understands [HDI's] philosophy, strategy and objectives;
      c)      works alongside HGS to control costs, settle claims equitably, and look to achieve profit while always considering the Insured;

***

**6.    Reserving Philosophy**

6.1    Where possible accurate reserves (being the estimated final cost of the claim inclusive of all fees, costs and other outgoings) based on the likely outcome of the claim must be set by NBIS at the first notification of loss ("**FNOL**").

6.2    Where there is insufficient information to establish an accurate reserve, a formula or 'flag' reserve may temporarily be placed on the claim.  However, 'flag' or 'costs only' reserves should never be established where it is known that serious third party injury has been sustained.  Initial reserves should always try to reflect any serious injury or loss known to have been sustained, if applicable.

6.3    Initial reserves should be established with consent from HGS for straightforward cases within thirty (30) days of a first report and for complex cases within ninety (90) days of a first report.  In all cases, "flag" reserves should never remain on a Claim for more than ninety (90) days.

Ex. A at NBIS 07705-11.

20.    NBIS agreed to indemnify HDI for losses, damages, costs or expenses suffered by it arising out of NBIS' negligence, any other tort or breach of contract.  Specifically, the pertinent **INSURANCE, LIABILITY AND INDEMNITY** provisions state:

***

28.5    NBIS will be liable for any direct loss, damage, cost or expense (including, but not limited to, fines, loss of profit, revenue or anticipated savings) incurred or suffered by [HDI], its employees, officers or directors arising out of or in connection with any negligence or any other tort or any breach of contract by NBIS or any of its officers, or employees.

28.6    In the event that either Party is in default of its obligations under this Agreement then the Defaulting Party shall indemnify the other

party in respect of all direct losses, liabilities, costs and expenses arising from a breach of this Agreement by the Defaulting Party (including, without limitation, all losses, risks, costs and expenses incurred as a result of defending or settling any Claim brought by a third party) to the extent that the Defaulting Party or any of its agents or employees has or have been negligent, fraudulent or in willful default in respect of their duties under this Agreement.

Ex. A at NBIS 07700.

21.     The TPA Agreement contains a **DISPUTE RESOLUTION** provision at §20:

20.1    Resolution by senior managers

20.1.1  Either party may refer any Dispute in writing for final settlement to the Director of Claims of HGS or one of the Executive Vice Presidents of NBIS (or, if they are not available, their appointed deputies).  The Parties shall ensure that these representatives consider the Dispute as soon as practicable.

20.1.2  If these representatives fail to reach agreement within thirty (30) days after the referral (or such other period as the Parties may agree in writing), either Party may refer the Dispute for settlement to the Chief Executive Officer of NBIS and the Chief Executive Officer of HGS (or, if they are not available, their appointed deputies).  The Parties shall ensure that these representatives consider the Dispute as soon as practicable and then for a period of up to seven (7) days following the referral.

20.2    Mediation

If the Parties cannot resolve the Dispute within the timeframe described in Article 20.1.2, the Dispute may be referred by either Party to mediation in accordance with the then current rules of JAMS in the relevant US state. The mediator shall be agreed upon between the Parties.  Failing such agreement within fifteen (15) days of one Party requesting the appointment of a mediator and providing their suggested candidate, the mediator shall be appointed by JAMS at the request of either Party.  The costs of such mediation (including the costs of the mediator) shall be split equally between the Parties.

20.3    Courts

Subject to first following the implementation of the above procedures, nothing in this Article 20 shall operate to restrict, delay, or prevent either Party exercising any other rights they may have under this Agreement including recourse to the court of competent jurisdiction in New York.

Ex. A at NBIS 07697-07698.

22.    The parties have attempted, but failed, to resolve the dispute under §§20.1 and 20.2 and now are proceeding under §20.3.

23.    The TPA Agreement contains a **GOVERNING LAW AND JURISDICTION** provision at §23:

> The Agreement shall be governed and construed in all respects in accordance with the laws of the state of New York.  Subject to Article 20, the State courts of New York shall have exclusive jurisdiction to settle any Dispute that arises out of or in connection with this Agreement or its subject matter or formation.

Ex. A at NBIS 7698.

**B.    The Policy Issued To Omega Morgan**

24.    As the MGU, NBIS issued the Policy to Omega Morgan effective March 1, 2019 to March 1, 2020.  The Policy identifies HDI as the insurer and NBIS as the producer.

25.    The Policy's Commercial General Liability limits were $2,000,000 per occurrence with a general aggregate limit of $4,000,000.

**C.    The Tower Crane Collapse**

26.    On April 27, 2019, a tower crane collapsed in Seattle, Washington resulting in four fatalities, several bodily injuries, and a property damage claim.

27.    From the beginning of its handling of the claims, NBIS repeatedly told HDI that Omega Morgan was not liable for the collapse. In doing so, it relied heavily on a Washington State

Labor & Industries Department decision that exonerated Omega Morgan from any statutory violations following the accident.

28.     Although defense counsel informed NBIS that the Department's conclusions are not admissible in litigation, NBIS repeatedly noted in its Large Loss Reports under the "Liability" section that the Department of Labor & Industries issued "a letter dated [October 17, 2019] indicating no safety violations or penalties against Omega Rigging & Machinery Moving, Inc. or Omega Morgan." Based on its repeated inclusion of the language in each Report, NBIS considered the Department's findings to be relevant in evaluating Omega Morgan's liability.

**D.     NBIS's Mishandling Of The Lawsuits Filed Against Omega Morgan**

29.     Multiple lawsuits were filed against various parties, including Omega Morgan, in King County Superior Court in Washington.

30.     Rather than reassessing Omega Morgan's liability at various stages during the discovery of the case, NBIS consistently and repeatedly voiced its belief that Omega Morgan would escape the litigation with little, if any, liability. To maintain its view, NBIS ignored the views and opinions of other counsel in the case, and at least one respected mediator, without so much as even questioning the possibility that the views of others in the case might have a modicum of merit.

31.     On or around October 8, 2020, the defendants participated in a voluntary "defense only" mediation intended to develop a plan to resolve all of the plaintiffs' claims. The mediation failed because the general contractor (GLY) and the owner of the crane (Morrow Equipment) adopted different philosophies toward settlement. Morrow argued that the defendants should agree to an allocation based on liability, but GLY wanted the defendants to allocate shares based on available policy limits and to fight liability later.

32.     If GLY's "policy limits" approach would have prevailed, Omega Morgan's $7,000,000 of coverage (HDI's $2,000,000 primary policy and a $5,000,000 excess policy) would have accounted for 3% of the total amount of insurance coverage available to all defendants.

33.     GLY's mediation statement was provided to NBIS.  It contained a description of Omega Morgan's acts and omissions and described why GLY believed Omega Morgan had liability exposure arising out of its conduct relating to potential duties and breaches involving (1) wind/forecasting; (2) allegations of a deviation from its lift plan; and (3) exposure arising from a failed "pick attempt." Despite these potential weaknesses in Omega Morgan's defenses, NBIS did not discuss them with HDI nor did it discuss the merits of GLY's defense counsel's "policy limits allocation" approach to the mediation.

34.     NBIS's refusal even to consider the possibility of settlement was fueled by Art Kirkner, a seasoned veteran in handling tower crane collapses and a Vice President at NBIS ("Kirkner"), who repeatedly and forcefully expressed his opinion to HDI that Omega Morgan was not liable.

35.     For example, on October 7, 2020, the day before the mediation, Kirkner wrote two separate emails stating "Omega Morgan has little, if any liability" and "OMEGA-MORGAN appears to have no liability."

36.     In addition, Kirkner strongly urged HDI to not commit to any liability apportionment for Omega Morgan. The mediation was unsuccessful.

37.     The mediator, however, offered his opinion that Omega Morgan's liability arose out of a question involving the wind speed on the day of the collapse and whether Omega Morgan had a duty to communicate that information to others. This is because Omega Morgan's crane had the only operating wind gauge on site on the day of the accident. The mediator further opined that

the potential aggregate value of the case was $125,000,000 and noted that even a small percentage of fault attributed to Omega Morgan could result in exposure in the millions of dollars.

38.    Despite the views and warnings expressed at the mediation and by counsel for the other defendants, NBIS and Kirkner continued to take the view that HDI should not settle the claims against Omega Morgan. Kirkner wrote: "I just do not see liability on Omega Morgan and nothing said in yesterday's co-deft only mediation implicated OM from an evidentiary standpoint (just empty assertions)."

39.    On or about November 6, 2021, the plaintiffs made a policy limits demand on all defendants in the litigation.

40.    NBIS effectively ignored the policy limits demand. It did not initiate discussions on the merits of the demand, how to respond to it, or whether to counter it. It did not consider the impact a rejection might have on Omega Morgan, let alone put Omega Morgan at the forefront of the decision as required by §2.1 of Schedule 1 of the TPA Agreement. Finally, it failed to inform HDI that, under Washington law, when an insurer unreasonably denies a policy limits demand, it could be exposed to damages in excess of the policy limits.

41.    On or about November 9, 2021, defense counsel submitted a status report informing HDI and NBIS of the policy limits demand.

42.    On or about November 15, 2021, Kirkner responded to another email from defense counsel and included a request to defense counsel to prepare "a denial letter rejecting the demand for us to review with respective carriers."

43.    On or about November 16, 2021, NBIS submitted letters to HDI and the excess carrier that rejected the policy limits demand. The letters did not contain a counter-offer or a suggestion that settlement discussions should occur at a later point in time. Instead, the letters

blamed others for the collapse and referenced Omega Morgan's pending Motion for Summary Judgment.

44.    Because NBIS did not provide any advice to HDI setting forth the dangers of an outright denial of a policy limits demand, HDI agreed to send the letter rejecting the demand as drafted.

45.    On or about November 19, 2021, Kirkner sent an email to defense counsel asking about settlement rumors involving Omega Morgan and one other defendant, Seaburg Construction, who was viewed as having limited culpability as its only involvement was to employ the tower crane operator.

46.    On or about November 23, 2021, defense counsel reported that plaintiffs' counsel acknowledged receipt of the denial letters from HDI and the excess carrier and requested copies of any "no limits" or "Blue Sky" letters issued to Omega Morgan by its insurers, in addition to the identity and contact information for independent counsel retained by Omega Morgan.

47.    A "Blue Sky" letter is issued by an insurer to its insured waiving coverage defenses and policy limits. It has the effect of removing an insured's potential bad faith claim against its insurer for any reason, including a failure to settle within policy limits.

48.    On or about November 25, 2021, defense counsel reported to NBIS and HDI, among others, that GLY, the general contractor, had tendered its policy limits in settlement of the lawsuits. Defense counsel also noted plaintiffs' counsel's intention to go to trial against Omega Morgan only if it did not settle with plaintiffs. By December 1, 2021, all defendants except Omega Morgan had settled.

49.     On or about December 1, 2021, defense counsel reported receiving a letter from plaintiffs' counsel describing plans to pursue an Assignment of Rights for bad faith claims against Omega Morgan's carriers in the event a "Blue Sky" letter had not been issued to Omega Morgan.

**E.     The Blue Sky Letter**

50.     In the midst of these developments, Omega Morgan retained independent counsel who sent an email on or about December 3, 2021 stating in part:

> It is clear to me, based on the information I have learned regarding this matter, that the issuance of a 'blue sky' letter is appropriate and necessary.

51.     On or  about December 3, 2021, defense counsel reported that the Court denied Omega Morgan's Motion for Summary Judgment.

52.     Also, on December 6, 2021, one of plaintiffs' counsel sent an email to defense counsel, who forwarded it to NBIS, that stated in relevant part:

> Even a casual review of [Omega Morgan's Motion for Summary Judgment] and the number and depth of our opposing experts rendered it a nonstarter. What I don't understand is why the motion went forward without negotiating protection from such an unwise and unreasonable gamble. The plaintiffs were certainly receptive and offered a global release of all defendants. With liability not only strong but exacerbated and damages significantly in excess of limits, all of the other defendants and insurers agreed. Omega was the only defendant to refuse to negotiate, choosing to roll the dice and blindlessly take such a risk. This was reckless and foolish.

There is nothing in writing from NBIS responding to plaintiffs' counsel's criticisms.

53.     On or about December 8, 2021, Omega Morgan's independent counsel sent a letter to NBIS and the insurers describing joint and several liability under Washington law in cases involving "no fault" plaintiffs. Counsel stated:

> Even if found only 0.01% at fault, Omega Morgan faces the risk of being jointly and severally liable for tens of millions of dollars if not more than a hundred million.

*** 

13

It is also significant to note that in the correspondence from NBIS rejecting plaintiffs' settlement demand, it pointed to Omega Morgan's then pending motion for summary judgment as to why Omega Morgan was refusing to settle. It is as though NBIS (speaking for HDI and [the excess insurer]) assumed there was a 100% chance that the summary judgment motion would be granted, yet defense counsel had already advised that the motion had no better than a 50% chance of success. Such brazen disregard for the insured's interests is remarkable.

54.    At a subsequent mediation held on December 16, 2021, plaintiffs' counsel made clear that the opportunity to settle for policy limits was no longer available to Omega Morgan. At the mediation, plaintiffs' counsel demanded Omega Morgan's $7 million policy limits and a stipulation to judgment in an unspecified amount in exchange for a covenant not to execute against it and an assignment to plaintiffs of any bad faith claims against the insurers.

55.    Faced with two difficult choices, HDI decided to issue the "Blue Sky" letter to Omega Morgan and did so on January 4, 2022.

**F.    The Trial And The Judgment**

56.    At a pretrial hearing on January 24, 2022, the Court granted plaintiffs' motion to exclude any reference to the Washington State Labor & Industries Department's findings and conclusions exonerating Omega Morgan from any statutory workplace violations. Trial commenced on or around February 1, 2022 and continued into early March.

57.    On or about March 4, 2022, the jury began deliberations and reached a verdict on March 14, 2022 against NWTC, Omega Morgan and Morrow Equipment. NWTC was found to be 45% at fault; Omega Morgan was found to be 30% at fault and Morrow Equipment was found to be 25% at fault. The total amount of damages awarded to all plaintiffs was $150,300,000 with the single largest individual awards going to the two decedents' estates at $35,400,000 each and the lowest award of $1,300,000 to an injured bystander.

58.     NWTC did not or could not pay any amount of the judgment over its available insurance totaling approximately $5.4 million. Therefore, with statutory costs and interest, HDI paid $120,387,073.85 to the plaintiffs in these lawsuits. It subsequently paid $13,025,000 to five additional plaintiffs who filed lawsuits that were not consolidated with the cases that commenced trial in King County Court in February 2022. Therefore, HDI paid a total of $133,411,509.61 and recovered $5,413,307.52 from NWTC's insurers making its net payment $127,326,839.59.

59.     The Judgment was upheld on appeal.

**G.     NBIS's Reserve Recommendations Misled HDI**

60.     In addition to mishandling the policy limits demand, misunderstanding Washington law on joint and several liability, failing to put the insured, Omega Morgan's, interests first, and failing to reassess the insured's liability, NBIS also misled HDI by establishing and maintaining unrealistically low indemnity reserves.

61.     Section 6 of Schedule 1 to the TPA Agreement provides, among other obligations, that NBIS must set accurate reserves based on the likely outcome of the claim at the first notification of loss or within the first 90 days. As stated "Initial reserves should always try to reflect any serious injury or loss known to have been sustained."

62.     Despite four fatalities and other serious bodily injuries, NBIS initially recommended an indemnity reserve of $1,100 on or around April 15, 2020, almost one year after the accident. NBIS maintained that reserve through January 19, 2022.

63.     Because of the low reserve established, senior management at HDI were not alerted to the gravity of the case and did not intervene to inquire about the proceedings until after plaintiff's counsel took the position that the case could no longer be settled for policy limits and

after Omega Morgan's independent counsel demanded that HDI issue a "Blue Sky" Letter. At that point, it was too late to change the course of events

64.     Of note, an HDI employee reviewing loss bordereaux prepared by TPAs would not suspect an indemnity reserve of $1,100 represented a serious claim.

65.     The failure to set and maintain adequate loss reserves contributed to the damages sustained by HDI because it prevented HDI from fully understanding the severity of the claims.

66.     As a consequence of NBIS's mishandling of the lawsuits brought against Omega Morgan, HDI was damaged and incurred other expenses falling within the scope of the TPA Agreement, including amounts paid to appellate counsel.

## CLAIMS FOR RELIEF

### COUNT I
**(Breach of Contract)**

67.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1-66 as if fully set forth herein.

68.     The TPA Agreement between HDI and NBIS is a valid and binding contract.

69.     HDI performed its obligations under the TPA Agreement.

70.     Pursuant to Sections 28.5 and 28.6, NBIS agreed to indemnify HDI for any direct loss, damage, liabilities, costs and expenses arising from a breach of this Agreement (including without limitation, all losses, risks, costs and expenses incurred as a result of defending or settling any claim brought by a third party) arising out of or in connection with any negligence or any other tort or any breach of contract by NBIS.

71.     NBIS failed to adequately perform and otherwise breached the TPA Agreement in at least the following ways:

(a)    by failing to use "all reasonable skill, care and judgment, in an efficient, competent professional cost-effective manner as is consistent with NBIS being a specialist in [the field of crane and rigging services] and in accordance with accepted professional and business practices" required by paragraph 8.1 of the Agreement;

(b)    by failing to ensure "that a claim is not unreasonably rejected" as required by paragraphs 8.11 and 8.11.3;

(c)    by failing to be knowledgeable and comply with all applicable Laws and/or Regulations in the jurisdiction relevant to each Claim or Claim file, including the policy limits demands and/or advising Omega Morgan as to the possibility of an excess judgment as required by Washington law, and by paragraph 1.12 of the Schedule;

(d)    by failing to put the insured at the forefront of all activities and decisions in violation of the Administrator Management provision found at Section 2 of the Services Schedule;

(e)    by failing to properly handle the policy limits demand to ensure that HDI was informed of the consequences of a wrongful denial and to ensure that the contents of the letter reflected an informed decision by HDI;

(f)    by failing to "control costs, settle claims equitably and look to achieve profit while always considering the insured" as required by Section 2.1 of the Schedule;

(g)    by failing to set an accurate and correct indemnity reserve despite the fact that the claim included four deaths and multiple other significant bodily injuries in violation of Section 6.2 of Schedule 1;

(h)    by failing to "keep [HDI] informed of all developments likely to affect the costs of any extended reporting incident" as required by Section 4.6.c of the Schedule.

72.     NBIS failed to evaluate the policy limits demand, failed to engage in reasonable settlement negotiations, failed to put the insured's interests first, and failed to monitor developments in the case affecting Omega Morgan's liability. In addition, NBIS's unfounded and unreasonable belief that Omega Morgan had virtually no liability for the damages at issue in the case created a false hope about the strength of Omega Morgan's defenses.

73.     NBIS's failure to revisit or re-evaluate its view of Omega Morgan's liability is underscored by GLY's counsel's repeated suggestion that a small percentage contribution (3%) from Omega Morgan could avoid the "real possibility that judgments against the remaining defendants (even after setoffs for earlier settlements) could exceed available insurance and open the door to bad faith litigation." When placed in context, the failure to re-evaluate liability or engage in settlement negotiations is particularly egregious since it was clear from at least the time of the October 2020 mediation that Omega Morgan faced challenges in the areas of (1) wind/forecasting; (2) allegedly deviating from its lift plan; and (3) failing at a "pick attempt." When faced with the option of recommending a relatively insignificant participation of 3% contribution for each settlement or face a catastrophic nine figure jury verdict, NBIS chose the latter for HDI and Omega Morgan.

74.     Under Sections 28.5 and 28.6 of the TPA Agreement referenced above, HDI is entitled to reimbursement of the damages, liabilities, costs and expenses incurred as a consequence of NBIS's breaches of the TPA Agreement set forth herein.

75.     In breach of its obligations under the TPA Agreement, NBIS has refused to indemnify HDI.

76.     NBIS's breaches were neither justified nor excused.

77.     NBIS's breaches caused HDI damages in an amount to be determined at trial but in no event less than $127,326,839.59 plus attorneys' fees, costs and interest that continues to accrue.

## COUNT II
### (Breach of the Covenant of Good Faith and Fair Dealing)

78.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1-77 as if fully set forth herein.

79.     The TPA Agreement is a valid and binding contract.

80.     The TPA Agreement contains an implied covenant of good faith and fair dealing which required NBIS to act with the utmost good faith and fair dealing and to avoid any act that would deprive HDI of the benefits of the TPA Agreement.

81.     NBIS breached its duty of good faith and fair dealing to HDI as set forth above in paragraphs 1 through 77.

82.     NBIS's breaches caused significant damage to HDI in an amount to be determined at trial but in no event less than $127,998,765.48 plus attorneys' fees, costs and interest that continues to accrue.

## COUNT III
### (Negligence)

83.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1-77 as if fully set forth herein.

84.     At all times relevant herein, NBIS owed a duty to HDI, separate and apart from any contractual obligation, to exercise due care in handling and managing claims against HDI's insureds, including Omega Morgan. NBIS's conduct as detailed herein, deviated in material respects from the recognized and accepted standards.

19

85.    NBIS, as an experienced TPA in crane collapse and heavy construction equipment cases, knew or should have known that a lawsuit involving fatalities of innocent victims who were not at fault would result in the assessment of liability against the defendants, even a *de minimis* share such as 3%.

86.    NBIS, as an experienced MGU and TPA, knew or should have known of the dangers of policy limits demands against an insured, the exposure to Omega Morgan to damages in excess of the policy limits and the potential bad faith exposure to HDI should a policy limits demand be unreasonably denied.

87.    NBIS's conduct was negligent in at least the following ways:

(a)    by failing to reassess liability at or around the time of the October 2020 mediation when GLY's defense counsel and the mediator suggested various areas of potential exposure to Omega Morgan;

(b)    by failing to engage in reasonable settlement negotiations and flatly rejecting the policy limits demand when all other defendants were negotiating and settling with the plaintiffs;

(c)    by failing to timely notify Omega Morgan of its potential liability exposure in excess of the policy limits;

(d)    by failing to properly handle the policy limits demand to ensure that HDI was informed of the consequences of a wrongful denial and to ensure that the contents of the letter reflected an informed decision by HDI;

(e)    by failing to question the circumstances surrounding the decision by Seaburg Construction to tender its policy limits despite the fact that its only involvement in the case was to employ the crane operator who was not involved with disassembling the tower crane;

(f)      by failing to understand the application of joint and several liability under Washington law with claims involving "no fault" plaintiffs.

88.      NBIS's breaches of the common law duties caused HDI to suffer significant damages in excess of $127 million plus fees and costs.

**WHEREFORE**, Plaintiff, HDI GLOBAL SPECIALTY SE, respectfully requests that the Court enter judgment in its favor and against Defendant as follows:

(a)      awarding damages in favor of HDI for all loss sustained as a result of NBIS's negligence and breaches in an amount to be determined at trial but in no event less than $127,998,765.48 plus attorneys' fees, costs and interest that continues to accrue;

(b)      awarding punitive damages on Count II of this Complaint for breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial;

(c)      awarding HDI attorneys' fees as well as its costs, expenses and disbursements in prosecuting this action pursuant to the terms of the TPA Agreement;

(d)      awarding any other and further relief the Court deems just and proper.

Dated:  February 14, 2025

**WEBER GALLAGHER SIMPSON
STAPLETON FIRES & NEWBY, LLP**

**By:** *s/Denise M. DePekary (Attorney I.D. No. 2751998)*
Attorneys for Plaintiff,
HDI GLOBAL SPECIALTY SE
1500 Broadway #2401
New York, NY 10036
(929) 342-6000
ddepekary@wglaw.com